J-A15019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| REGGIE WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1090 EDA 2018 |

Appeal from the Judgment of Sentence August 17, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000754-2009

BEFORE:   BENDER, P.J.E., GANTMAN, P.J.E., and COLINS*, J.

MEMORANDUM BY GANTMAN, P.J.E.:           **FILED AUGUST 09, 2019**

Appellant, Reggie Williams, appeals from the reinstated judgment of sentence entered in the Philadelphia County Court of Common Pleas, following remand and the denial of his request for a new trial, based upon after-discovered evidence.  We affirm.

The relevant facts and procedural history of this case are as follows.  In the early morning of March 29, 2008, Appellant and his cohort, Bruce Lee, repeatedly kicked and stomped on Victim's head and face.  Victim died from his injuries that same day.  The Commonwealth charged Appellant and Mr. Lee separately for Victim's murder.  When Appellant proceeded to a jury trial in February 2011, Mr. Lee refused to testify, and the trial ended in a mistrial due to a hung jury.  Subsequently, Mr. Lee entered on February 22, 2012, a guilty plea to third-degree murder for the death of Victim and received a

_____
* Retired Senior Judge assigned to the Superior Court.

sentence of seven (7) to fourteen (14) years' incarceration. Appellant proceeded to a retrial in July 2013, and Mr. Lee again refused to testify on Appellant's behalf.

A prior memorandum decision of this Court sets forth the relevant testimony at Appellant's retrial as follows:

> On March 29, 2008, sometime before 3:20 a.m., [Victim] and his friend Harvey Tilghman went to Club 121, an after-hours nightclub at 35th and Wharton Streets in South Philadelphia. When [Victim] arrived at the nightclub he was met by Jana Perry, a female friend whom he had invited earlier. A short time after Ms. Perry entered the nightclub, she joined a line dance on the second floor of the establishment. While Ms. Perry was dancing, Mr. Tilghman and [Victim] stood on the left side of the dance floor and watched the dancers. [Appellant] and Bruce Lee were standing to the right of Mr. Tilghman and [Victim]. They were also watching the line dancers. Mr. Tilghman spoke to the two men and introduced them to [Victim]. While Ms. Perry was dancing, Bruce Lee tugged at her about three times. Toward the end of the dance, Bruce Lee reached his hand out to Ms. Perry. [Victim] also reached his hand out to her. Ms. Perry chose [Victim].
>
> [Victim] was then knocked to the floor and rendered unconscious, lying flat on his back. His face was swollen and he was barely breathing. Mr. Tilghman kneeled to the floor and attempted to aid his friend. As Mr. Tilghman attended to [Victim], [Appellant] and Bruce Lee proceeded to stomp on [Victim]'s face at least twice. [Appellant] was 6'2" tall and weighed 215 pounds. Bruce Lee was 6'5" tall and weighed 260 pounds. Both men were wearing Timberland boots. During the assault on [Victim], Mr. Tilghman and [Appellant] engaged in a shoving match with each other. [Appellant] pushed Mr. Tilghman, causing him to fall over [Victim] who was still lying on the floor. Mr. Tilghman rose and said: "I told you that was my friend, what did you do?" [Appellant] yelled back: "He disrespected me." Within seconds, security responded and separated the two men. The nightclub patrons scattered and some left the

establishment. [Appellant] fled the scene. Minutes later, police arrived on the scene.

[Victim] was pronounced dead at the Hospital of the University of Pennsylvania on March 29, 2008, at about 4:10 a.m. At trial, Dr. Gary Collins, deputy chief medical examiner, testified as the Commonwealth's forensic pathology expert. After conducting an autopsy of [Victim], Dr. Collins concluded to a reasonable degree of medical certainty that the cause of death was [a] blunt impact facial injury. [Victim] sustained a palpable fracture of his maxillary, right cheek bone, and nasal bone. His right cheek, right lower and upper eyelids, and right upper lip were bruised and swollen significantly. Dr. Collins further observed a three-point pattern on [Victim]'s right cheek. [Victim] also sustained injury to his lower lip, where there were two lacerations: one across his lower lip and one that separated his lower lip from the gum line. Dr. Collins further observed blood stains inside [Victim]'s oral and nasal cavities and lungs. There were no other blunt or sharp injuries or wounds to the remainder of his body.

[Victim] bled profusely from his facial injuries. As a result, he suffocated from blood that obstructed his airways. Dr. Collins explained that an individual who is bleeding significantly from the nose and mouth will suffocate if he is unable to clear the accumulating blood from those cavities. The individual will then suffer from a lack of oxygen to the lungs or the brain. In addition to determining the cause of death, Dr. Collins concluded to a reasonable degree of medical certainty that the manner of death was homicide. The blunt impact facial injury and the lack of injury to the remainder of the body was consistent with testimony that [Victim]'s face was moderately to significantly impacted at least twice by a hard blunt object.

On March 29, 2008, at 3:20 a.m., Sergeant Michael Davis responded to Club 121 after receiving a radio call about a fight. Within seconds other officers including Police Officers Donofrio and Corrado arrived on the scene and proceeded to the second floor of the nightclub with Sergeant Davis. When they reached the dance floor, [Victim] was still lying on the floor. His face was swollen and covered in blood and he was blowing bubbles of blood from his nose and mouth.

- 3 -

Sergeant Davis requested expedited rescue and moved the crowd surrounding [Victim] while Officer Corrado administered CPR. Sergeant Davis also asked responding officers to control the crowd and to return as many patrons as possible to the nightclub. About 30 to 40 people remained inside the first floor of the nightclub. Unfortunately, [Victim] stopped breathing while rescue was on location.

At about 5:45 a.m., Crime Scene Officer William Trenwith responded and conducted a walkthrough of the crime scene. He collected a swab from the large pool of blood found on the banquet room dance floor, one black baseball cap…, and one pair of eyeglasses found on a nearby table. Officer Trenwith submitted this evidence to the criminalistics laboratory. Officer Trenwith also retrieved cups, glasses, and beer bottles and lifted thirteen (13) fingerprints from these items. He submitted the fingerprints to the Latent Fingerprint Unit.

Mr. Tilghman provided three statements regarding this incident to police. On March 29, 2008, at 3:20 a.m., he gave his first statement to Detective Kevin Conaway on the second floor of the nightclub. He did not identify either perpetrator during this interview. In his two-page statement, Mr. Tilghman stated that he did not see anything because his back was turned during the incident. Mr. Tilghman stated that after hearing the commotion, he turned and saw a man lying on the floor with plywood on his face. He further stated that he first recognized his friend by the camouflage vest [Victim] was wearing. After [Victim] was pronounced dead, Detective Conaway transported Mr. Tilghman to the Homicide Unit where he provided a second statement to Detectives Morton and Holmes. In this statement, given on March 29, 2008, at 5:25 a.m., Mr. Tilghman gave an account of the incident and identified a photograph of [Victim]. He did not identify the perpetrators, but stated that he saw a brown boot stomping on [Victim].

After returning home, Mr. Tilghman could not sleep and continued to think of his deceased friend. On March 31, 2008, at 8:55 a.m., Mr. Tilghman went to the Homicide Unit on his own accord and provided a third statement to detectives. In his third statement, Mr. Tilghman identified

- 4 -

[Appellant] as "one of the ones" that he saw stomping on [Victim]. Mr. Tilghman identified [Appellant] from a photograph and told police that he has known him for at least ten years. After identifying [Appellant], Mr. Tilghman was shown a separate photographic array. He identified Bruce Lee from the photographic array and stated that Bruce Lee was with [Appellant] at the nightclub. He described [Appellant] as about 6'2" or 6'3" tall and Bruce Lee as about 6'3" tall. Mr. Tilghman told police that he only saw [Appellant] stomping on [Victim], but he believed that more than one person stomped his friend. He also told police that he saw [Appellant] stomp [Victim] in the face at least once, but that it could have been more than once. However, at trial, Mr. Tilghman stated that he saw…[V]ictim being stomped on at least twice.

At trial, Mr. Tilghman explained his initial failure to identify [Appellant]. He stated that he felt pressured and was afraid of the neighbors' response to his cooperation with police. During his initial interview by Detective Conaway, some of the people inside the nightclub were from his neighborhood. [Appellant] also lived in the neighborhood, about one block away from Mr. Tilghman. At trial, Mr. Tilghman stated that he was "petrified" for his family and for himself. He stated, "If you tell, basically, everybody going to be against you and you can get killed that way, easy." Detective Conaway testified that Mr. Tilghman appeared worried and upset during the first interview. About one month after providing his third statement to police, Mr. Tilghman moved out of state. He has not returned to Philadelphia except to testify in this case on two separate occasions.

On March 29, 2008, at about 6:50 a.m., Detective George Fetters interviewed Jana Perry. During the interview, Ms. Perry provided a description of one perpetrator. She was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Perry identified Bruce Lee and stated: "Yes, this one. He's the one that was trying to talk with me and he's the one that stomped [Victim] then he rolled out. I didn't see him again after that." At trial, Ms. Perry did not recall providing a description to police. She also claimed to have used the "eeny meeny miny moe" method when she identified Bruce Lee from the photographic array. However, Detective Fetters testified

that Ms. Perry did not hesitate when she made her identification.

On March 29, 2008, at 9:50 a.m., Detective Thomas Gaul interviewed Loretta Epps, who was a nightclub patron when this incident occurred. During the interview, Ms. Epps described two perpetrators: one man was taller than Detective Gaul, who was 6'3", and the other man was even taller and wearing a white baseball cap and red jacket. Ms. Epps was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Epps identified Bruce Lee and stated: "This guy was on the bar second floor. I can't say for sure he was one of the guys who was stomping on the guy though." At trial, Ms. Epps further described the two perpetrators. The man stomping…[V]ictim's head and neck was about 6'2" or 6'3" tall and a fairly thin person who weighed about 190 to 210 pounds. He was wearing a red jacket, white baseball cap, and tan Timberland boots. The second man may have been a little shorter and slimmer than the first man.

Detective Verrechio was the assigned investigator in this homicide case. Based on his investigation, he obtained arrest warrants for [Appellant] and Bruce Lee on April 5, 2008. He also obtained search warrants for [Appellant's] residence at 2639 Oakford Street and Bruce Lee's residence at 2645 Oakford Street in Philadelphia. These properties are three doors apart from each other and approximately nine (9) or ten (10) blocks away from Club 121 at 35th and Wharton Streets. Detectives executed the search warrant at [Appellant's] residence, but nothing of evidentiary value was recovered. [Appellant] was not present in his home when police served the arrest warrant. Detective Verrechio left his contact information and a copy of the search warrant with a female relative. [Appellant] later contacted police and told them that he would surrender on a date certain, but he failed to do so.

On April 5, 2008, Detective Steven Mostovyk executed a search warrant at 1248 South 27th Street in Philadelphia, the address of Bruce Lee's friend Latifa Sharee Allison. This residence is just around the corner from 2639 Oakford Street. During the execution of this search warrant, Detective Mostovyk recovered two pairs of size 13

Timberland boots, one tan and one light brown, and submitted them to the criminalistics laboratory. Later that day, Bruce Lee was arrested at his girlfriend's house in Yeadon, Pennsylvania. At that time, Bruce Lee was 6'5" tall and weighed 260 pounds.

In the early morning hours of April 9, 2008, police officers returned to [Appellant's] residence. Shortly after knocking and announcing their presence, Sergeant Davis heard the door latch turn. When Police Officer Thomas Dydra looked through the living room window, he saw a dark shadow walk up to the door and then back up against the wall. Officer Dydra communicated his observation to Sergeant Davis, and the men waited a few minutes. No one responded. Sergeant Davis then knocked harder and announced louder. When no one responded Sergeant Davis loudly requested a sledgehammer and a halligan bar to assist in opening the door. At that time [Appellant] opened the door and said: "I'm right here." [Appellant] was arrested and transported to the Homicide Unit. After [Appellant's] arrest Detective John Cahill completed a biographical report of [Appellant] on April 9, 2008. At that time, [Appellant] was 6' 2" tall and weighed 215 pounds. He was wearing a white thermal long sleeve shirt, blue denim jeans, and tan Timberland boots size 11½. Detective Cahill confiscated those items from [Appellant] and submitted them to the criminalistics laboratory. In his report, Detective Cahill noted that [Appellant] named Bruce Lee as an associate. After [Appellant] and Bruce Lee were arrested, Detective Singleton obtained two buccal swabs from each man and submitted them to the criminalistics laboratory.

At trial, Gamal Emira testified as a forensic science expert. Mr. Emira analyzed the evidence submitted to the criminalistics laboratory and prepared a report. The dark red stain swab [taken from the pool of blood on the floor of the club] tested positive for blood. Mr. Emira did not see any blood stains on visual examination of the black baseball cap. He observed a rootless human brown hair fragment. He also cut a piece of the sweatband from the cap for identification purposes. He also swabbed the recovered eyeglasses. His visual examination of the tan size 11½ Timberland boots recovered from [Appellant] reaped one microscopic brown stain on the left side of the left boot. He

- 7 -

did not find any other stains. Mr. Emira testified that he suspected that it was blood, but he did not conduct blood testing because of the sample's small size. Instead, he swabbed the stain and submitted it for DNA testing. Mr. Emira also observed brown stains during his visual examination of the two pairs of size 13 Timberland boots recovered from Bruce Lee. Mr. Benjamin Levin, a DNA science expert, received and analyzed the swabs Mr. Emira submitted to the DNA laboratory. Mr. Levin concluded to a reasonable degree of scientific certainty that the dark brown stain swab recovered from the banquet room dance floor was from [Victim]. There were no DNA results from [Appellant's] left Timberland boot, the sweatband, the eyeglasses, or Bruce Lee's right Timberland boot.

*Commonwealth v. Williams*, 156 A.3d 352, at *1-*4 (Pa.Super. 2016) (unpublished memorandum), *appeal denied*, 641 Pa. 606, 169 A.3d 32 (2017).

On July 26, 2013, the jury convicted Appellant of one count of third-degree murder. The court sentenced Appellant on December 6, 2013, to twenty (20) to forty (40) years' incarceration. Appellant timely filed post-sentence motions, which the court denied on August 8, 2014. On August 28, 2014, Appellant filed a timely notice of appeal.

While Appellant's direct appeal was pending, he filed in the trial court on June 24, 2015, a petition purportedly brought under the Post Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546.[1] In the petition, Appellant

---

[1] We note Appellant's PCRA petition was premature, because Appellant filed the petition while his direct appeal was pending in this Court. *See Commonwealth v. Kubis*, 808 A.2d 196, 198 n.4 (Pa.Super. 2002), appeal denied, 572 Pa. 700, 813 A.2d 839 (2002) (providing PCRA "has no applicability until the judgment of sentence becomes final").

stated he had obtained after-discovered evidence in the form of an affidavit from Mr. Lee, in which Mr. Lee said he alone had inflicted the fatal injuries upon Victim. Mr. Lee claimed he had a "change of heart" and was now willing to testify on Appellant's behalf. Appellant filed in this Court on August 7, 2015, a "Petition for Remand," requesting this Court to remand to allow Appellant to present Mr. Lee's affidavit and testimony.

On August 30, 2016, this Court affirmed Appellant's conviction and found without merit Appellant's challenges to, *inter alia*, the sufficiency and weight of the evidence. This Court, however, also vacated Appellant's judgment of sentence and remanded for the trial court to hold an evidentiary hearing limited to whether Appellant's alleged after-discovered evidence warranted a new trial. Our Supreme Court denied Appellant's petition for allowance of appeal on March 30, 2017. **See Williams, supra**.

On August 18, 2017, the trial court conducted an evidentiary hearing upon remand and heard testimony from Mr. Lee. Mr. Lee testified he had an altercation with Victim on the second floor of Club 121 on March 29, 2008, during which he punched Victim in the face, causing Victim to fall to the ground unconscious. Mr. Lee said he then stomped on Victim's face several times. Mr. Tilghman attempted to stop Mr. Lee, but Mr. Lee pushed Mr. Tilghman away and stomped on Victim's face several more times. Mr. Lee stated Appellant was not with Mr. Lee throughout his altercation with Victim, as Appellant was downstairs, on the first floor of the club. Mr. Lee added Mr.

Tilghman inaccurately testified as to the events of March 29, 2008, at Mr. Lee's and Appellant's joint preliminary hearing. Mr. Lee noted Mr. Tilghman claimed to have grabbed Appellant during the incident, not Mr. Lee. Mr. Lee said Mr. Tilghman confused Appellant for Mr. Lee throughout his preliminary hearing testimony. Mr. Lee claimed he told his attorneys during Mr. Tilghman's preliminary hearing testimony, "This is what happened between myself and Mr. Tilghman. [Appellant] wasn't with me." When asked why he did not testify at Appellant's first trial, Mr. Lee explained his attorneys advised him against testifying because his criminal charge for Victim's murder was still pending. Mr. Lee acknowledged he had entered a guilty plea to the murder of Victim prior to Appellant's retrial. When asked why he declined to testify at Appellant's retrial, Mr. Lee said, "I was being hot-headed, I was upset pertaining to my situation as far as sentencing." (N.T. Remand Hearing, 8/18/17, at 16-28).

During the hearing, Appellant also introduced the statement Steven Murphy had given to police on March 29, 2008.[2] In his statement, Mr. Murphy explained he was a part-time manager of Club 121 and was working there when the incident occurred. Mr. Murphy told police he saw Mr. Lee stomp on Victim, but did not see anyone else strike Victim. (*Id.* at 75-76, Exhibit "D-6"; Appellant's Brief at Appendix "B").

_____

[2] Mr. Murphy testified at Appellant's first trial, but not at Appellant's retrial.

On November 7, 2017, the trial court conducted a second remand hearing, during which it heard the testimony of Thomas McGill, Esq. Mr. McGill explained he represented Appellant at the preliminary hearing and both trials. Mr. McGill said he was near Mr. Lee while waiting for Appellant prior to the start of the preliminary hearing. Mr. McGill recalled Mr. Lee said to him when Appellant entered, "[Appellant] didn't have anything to do with this. He shouldn't even be here." Mr. McGill added he had arranged for Mr. Lee to be brought to the courthouse from prison during Appellant's retrial, because Appellant had information Mr. Lee would testify that Appellant was not involved in the incident. Mr. McGill said he met with Mr. Lee in the courthouse cell room during a lunch break during Appellant's retrial to discuss Mr. Lee's testifying on Appellant's behalf. Mr. Lee, however, refused to testify. When Mr. McGill asked why Mr. Lee would not testify, Mr. Lee said, "I'm serving my sentence. I have to come up for parole at some point." Mr. Lee added, "Based on what folks have told me, I probably wouldn't be here if it hadn't been for [Appellant]." (N.T. Remand Hearing, 11/7/17, at 5-11).

On March 9, 2018, the trial court stated on the record that it found Mr. Lee incredible. That same day, the court entered an order dismissing Appellant's premature PCRA petition and denying his request for a new trial. Appellant filed a timely notice of appeal on April 9, 2018. The court ordered Appellant on April 10, 2018, to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b); Appellant timely complied on April 25,

2018. On August 17, 2018, the trial court re-imposed Appellant's December 6, 2013 judgment of sentence.[3]

Appellant raises one issue for our review:

> WHERE THE TESTIMONY OF BRUCE LEE, PRESENTED TO THE [TRIAL] COURT ON REMAND, WAS SO COMPELLING AS TO MEET ALL THE PRONGS OF THE NEWLY-DISCOVERED EVIDENCE TEST, DID THE [TRIAL] COURT ERR AS A MATTER OF LAW IN DENYING A NEW TRIAL ON THE BASIS OF THIS EVIDENCE?

(Appellant's Brief at 2).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Sandy L.V. Byrd, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed July 18, 2018, at 6-9) (finding: Mr. Lee was friend of Appellant; Mr. Lee failed to exculpate Appellant at both of Appellant's trials; as of retrial, Mr. Lee had already entered guilty plea, was serving his sentence, and did not have any Fifth Amendment privilege to assert; Mr. Lee told trial counsel he would not testify at retrial because, if not for Appellant, Mr. Lee would not be in situation he was in at that time; Mr. Lee's testimony

---

[3] Appellant's notice of appeal relates forward to August 17, 2018, the date the court reinstated Appellant's judgment of sentence. Therefore, we have no jurisdictional impediments to our review. *See* Pa.R.A.P. 905(a)(5) (stating: "A notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof").

was incredible and was not of such nature and character that verdict would differ if court granted new trial to permit Appellant to present Mr. Lee as exculpatory witness; therefore, Appellant failed to meet fourth prong of after-discovered evidence test; further, Appellant's claim that Mr. Lee's testimony contradicts trial testimony of Mr. Tilghman warrants no relief; Ms. Epps testified at trial that two people stomped on Victim; Mr. Tilghman identified one stomper as Appellant, and Ms. Perry identified other stomper as Mr. Lee; on initial direct appeal, Superior Court determined it was not unreasonable for these witnesses' statements to differ under circumstances of altercation, concluding witnesses' testimony was not so inconsistent as to be inherently unreliable; additionally, Appellant's claim Mr. Lee's testimony on remand is more reliable than Mr. Tilghman's trial testimony, because Mr. Murphy's statement to police corroborated Mr. Lee's testimony, fails, where Mr. Tilghman's testimony contradicted that evidence; at trial, jury rejected testimony of several defense witnesses who testified Appellant was on first floor of club during altercation as well as Appellant's version of events; jury accepted testimony of Commonwealth's witnesses, including Mr. Tilghman, Ms. Epps, and Ms. Perry).  The record supports the trial court's rationale. Accordingly, we affirm based on the trial court opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/9/19

FILED

2018 JUL 18 PM 2: 41

OFFICE OF JUDICIAL RECORDS
CRIMINAL DIVISION
FIRST JUDICIAL DISTRICT

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0000754-2009

: 

v. : CP-51-CR-0000754-2009 Comm. v. Williams, Reggie
Opinion

:

REGGIE WILLIAMS :

8138106331

## SUPPLEMENTAL OPINION

Byrd, J. July 18, 2018

After a February 22, 2011 mistrial, Reggie Williams was convicted of third-degree murder by a jury on July 26, 2013. Defendant was sentenced to a term of twenty (20) to forty (40) years incarceration on December 6, 2013. Post-sentence motions were denied on August 8, 2014, and Williams filed a notice of appeal on August 28, 2014. This court filed an opinion on April 30, 2015. On August 30, 2016, the Superior Court denied relief on defendant's substantive issues, but remanded for proceedings consistent with its opinion. In accordance therewith, this court held an evidentiary hearing on the after-discovered evidence claim presented in an affidavit by co-defendant Bruce Lee, with testimony taken on August 18, 2017, November 7, 2017, and March 9, 2018. On April 3, 2018, this court entered an order denying defendant's request for a new trial. Defendant filed a notice of appeal on April 9, 2018. On April 10, 2018, this court ordered defendant to file a statement of matters complained of on appeal. Said statement was filed April 25, 2018. This opinion follows.

1

## STATEMENT OF FACTS

The August 30, 2016 Superior Court opinion quoted the trial court's summary of the evidence as follows:

On March 29, 2008, sometime before 3:20 a.m., James Anderson and his friend Harvey Tilghman went to Club 121, an after-hours nightclub at 35th and Wharton Streets in South Philadelphia. When Mr. Anderson arrived at the nightclub he was met by Jana Perry, a female friend whom he had invited earlier. A short time after Ms. Perry entered the nightclub, she joined a line dance on the second floor of the establishment. While Ms. Perry was dancing, Mr. Tilghman and Mr. Anderson stood on the left side of the dance floor and watched the dancers. [Appellant] and Bruce Lee were standing to the right of Mr. Tilghman and Mr. Anderson. They were also watching the line dancers. Mr. Tilghman spoke to the two men and introduced them to Mr. Anderson. While Ms. Perry was dancing, Bruce Lee tugged at her about three times. Toward the end of the dance, Bruce Lee reached his hand out to Ms. Perry. Mr. Anderson also reached his hand out to her. Ms. Perry chose Mr. Anderson.

Mr. Anderson was then knocked to the floor and rendered unconscious, lying flat on his back. His face was swollen and he was barely breathing. Mr. Tilghman kneeled to the floor and attempted to aid his friend. As Mr. Tilghman attended to Mr. Anderson, [Appellant] and Bruce Lee proceeded to stomp on Mr. Anderson's face at least twice. [Appellant] was 6'2" tall and weighed 215 pounds. Bruce Lee was 6'5" tall and weighed 260 pounds. Both men were wearing Timberland boots. During the assault on decedent, Mr. Tilghman and [Appellant] engaged in a shoving match with each other. [Appellant] pushed Mr. Tilghman, causing him to fall over Mr. Anderson who was still lying on the floor. Mr. Tilghman rose and said: "I told you that was my friend, what did you do?" [Appellant] yelled back: "He disrespected me." Within seconds, security responded and separated the two men. The nightclub patrons scattered and some left the establishment. [Appellant] fled the scene. Minutes later, police arrived on the scene.

James Anderson was pronounced dead at the Hospital of the University of Pennsylvania on March 29, 2008 at about 4:10 a.m. At trial, Dr. Gary Collins, deputy chief medical examiner, testified as the Commonwealth's forensic pathology expert. After conducting an autopsy of Mr. Anderson, Dr. Collins concluded to a reasonable degree of medical certainty that the cause of death was [a] blunt impact facial injury. Mr. Anderson sustained a palpable fracture of his maxillary, right cheek bone, and nasal bone. His right cheek, right lower and upper eyelids, and right upper lip were bruised and swollen significantly. Dr. Collins further observed a three-point pattern on [Mr. Anderson's] right cheek. Mr. Anderson also sustained injury to his lower lip, where there were two lacerations: one across his lower lip and one that separated his lower lip from the gum line. Dr. Collins further observed blood stains inside Mr. Anderson's oral and nasal cavities and lungs. There were no other blunt or sharp injuries or wounds to the remainder of his body.

2

Mr. Anderson bled profusely from his facial injuries. As a result, he suffocated from blood that obstructed his airways. Dr. Collins explained that an individual who is bleeding significantly from the nose and mouth will suffocate if he is unable to clear the accumulating blood from those cavities. The individual will then suffer from a lack of oxygen to the lungs or the brain. In addition to determining the cause of death, Dr. Collins concluded to a reasonable degree of medical certainty that the manner of death was homicide. The blunt impact facial injury and the lack of injury to the remainder of the body was consistent with testimony that Mr. Anderson's face was moderately to significantly impacted at least twice by a hard blunt object. On March 29, 2008, at 3:20 a.m., Sergeant Michael Davis responded to Club 121 after receiving a radio call about a fight. Within seconds other officers including Police Officers Donofrio and Corrado arrived on the scene and proceeded to the second floor of the nightclub with Sergeant Davis. When they reached the dance floor, Mr. Anderson was still lying on the floor. His face was swollen and covered in blood and he was blowing bubbles of blood from his nose and mouth. Sergeant Davis requested expedited rescue and moved the crowd surrounding Mr. Anderson while Officer Corrado administered CPR. Sergeant Davis also asked responding officers to control the crowd and to return as many patrons as possible to the nightclub. About 30 to 40 people remained inside the first floor of the nightclub. Unfortunately, Mr. Anderson stopped breathing while rescue was on location.

At about 5:45 a.m., Crime Scene Officer William Trenwith responded and conducted a walkthrough of the crime scene. He collected a swab from the large pool of blood found on the banquet room dance floor, one black baseball cap, and one pair of eyeglasses found on a nearby table. Officer Trenwith submitted this evidence to the criminalistics laboratory. Officer Trenwith also retrieved cups, glasses, and beer bottles and lifted thirteen (13) fingerprints from these items. He submitted the fingerprints to the Latent Fingerprint Unit.

Mr. Tilghman provided three statements regarding this incident to police. On March 29, 2008, at 3:20 a.m., he gave his first statement to Detective Kevin Conaway on the second floor of the nightclub. He did not identify either perpetrator during this interview. In his two-page statement, Mr. Tilghman stated that he did not see anything because his back was turned during the incident. Mr. Tilghman stated that after hearing the commotion, he turned and saw a man lying on the floor with plywood on his face. He further stated that he first recognized his friend by the camouflage vest Mr. Anderson was wearing. After Mr. Anderson was pronounced dead, Detective Conaway transported Mr. Tilghman to the Homicide Unit where he provided a second statement to Detectives Morton and Holmes. In this statement, given on March 29, 2008, at 5:25 a.m., Mr. Tilghman gave an account of the incident and identified a photograph of the decedent. He did not identify the perpetrators, but stated that he saw a brown boot stomping on Mr. Anderson.

After returning home, Mr. Tilghman could not sleep and continued to think of his deceased friend. On March 31, 2008, at 8:55 a.m., Mr. Tilghman went to the Homicide Unit on his own accord and provided a third statement to detectives. In his third statement, Mr. Tilghman identified [Appellant] as "one of the ones" that he saw stomping on James Anderson. Mr. Tilghman identified [Appellant] from a photograph and told police that he has known him for at least ten years. After

3

identifying [Appellant], Mr. Tilghman was shown a separate photographic array. He identified Bruce Lee from the photographic array and stated that Bruce Lee was with [Appellant] at the nightclub. He described [Appellant] as about 6'2" or 6'3" tall and Bruce Lee as about 6'3" tall. Mr. Tilghman told police that he only saw [Appellant] stomping on Mr. Anderson, but he believed that more than one person stomped his friend. He also told police that he saw [Appellant] stomp Mr. Anderson in the face at least once, but that it could have been more than once. However, at trial, Mr. Tilghman stated that he saw the victim being stomped on at least twice.

At trial, Mr. Tilghman explained his initial failure to identify [Appellant]. He stated that he felt pressured and was afraid of the neighbors' response to his cooperation with police. During his initial interview by Detective Conaway, some of the people inside the nightclub were from his neighborhood. [Appellant] also lived in the neighborhood, about one block away from Mr. Tilghman. At trial, Mr. Tilghman stated that he was "petrified" for his family and for himself. He stated, "If you tell, basically, everybody going to be against you and you can get killed that way, easy." Detective Conaway testified that Mr. Tilghman appeared worried and upset during the first interview. About one month after providing his third statement to police, Mr. Tilghman moved out of state. He has not returned to Philadelphia except to testify in this case on two separate occasions.

On March 29, 2008, at about 6:50 a.m., Detective George Fetters interviewed Jana Perry. During the interview, Ms. Perry provided a description of one perpetrator. She was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Perry identified Bruce Lee and stated: "Yes, this one. He's the one that was trying to talk with me and he's the one that stomped Jimmy then he rolled out. I didn't see him again after that." At trial, Ms. Perry did not recall providing a description to police. She also claimed to have used the "eeny meeny miny moe" method when she identified Bruce Lee from the photographic array. However, Detective Fetters testified that Ms. Perry did not hesitate when she made her identification.

On March 29, 2008, at 9:50 a.m., Detective Thomas Gaul interviewed Loretta Epps, who was a nightclub patron when this incident occurred. During the interview, Ms. Epps described two perpetrators: one man was taller than Detective Gaul, who was 6'3", and the other man was even taller and wearing a white baseball cap and red jacket. Ms. Epps was also shown a photographic array and asked if she recognized anyone from the incident. Ms. Epps identified Bruce Lee and stated: "This guy was on the bar second floor. I can't say for sure he was one of the guys who was stomping on the guy though." At trial, Ms. Epps further described the two perpetrators. The man stomping the victim's head and neck was about 6'2" or 6'3" tall and a fairly thin person who weighed about 190 to 210 pounds. He was wearing a red jacket, white baseball cap, and tan Timberland boots. The second man may have been a little shorter and slimmer than the first man.

Detective Verrechio was the assigned investigator in this homicide case. Based on his investigation, he obtained arrest warrants for [Appellant] and Bruce Lee on April 5, 2008. He also obtained search warrants for [Appellant's] residence at 2639 Oakford Street and Bruce Lee's residence at 2645 Oakford Street in Philadelphia. These properties are three doors apart from each other and approximately nine (9)

4

or ten (10) blocks away from Club 121 at 35th and Wharton Streets. Detectives executed the search warrant at [Appellant's] residence, but nothing of evidentiary value was recovered. [Appellant] was not present in his home when police served the arrest warrant. Detective Verrechio left his contact information and a copy of the search warrant with a female relative. [Appellant] later contacted police and told them that he would surrender on a date certain, but he failed to do so.

On April 5, 2008 Detective Steven Mostovyk executed a search warrant at 1248 South 27th Street in Philadelphia, the address of Bruce Lee's friend Latifa Sharee Allison. This residence is just around the corner from 2639 Oakford Street. During the execution of this search warrant, Detective Mostovyk recovered two pairs of size 13 Timberland boots, one tan and one light brown, and submitted them to the criminalistics laboratory. Later that day, Bruce Lee was arrested at his girlfriend's house in Yeadon, Pennsylvania. At that time, Bruce Lee was 6'5" tall and weighed 260 pounds.

In the early morning hours of April 9, 2008 police officers returned to [Appellant's] residence. Shortly after knocking and announcing their presence, Sergeant Davis heard the door latch turn. When Police Officer Thomas Dydra looked through the living room window, he saw a dark shadow walk up to the door and then back up against the wall. Officer Dydra communicated his observation to Sergeant Davis, and the men waited a few minutes. No one responded. Sergeant Davis then knocked harder and announced louder. When no one responded Sergeant Davis loudly requested a sledgehammer and a halligan bar to assist in opening the door. At that time [Appellant] opened the door and said: "I'm right here." [Appellant] was arrested and transported to the Homicide Unit. After [Appellant's] arrest Detective John Cahill completed a biographical report of [Appellant] on April 9, 2008. At that time, [Appellant] was 6'2" tall and weighed 215 pounds. He was wearing a white thermal long sleeve shirt, blue denim jeans, and tan Timberland boots size 11½. Detective Cahill confiscated those items from [Appellant] and submitted them to the criminalistics laboratory. In his report, Detective Cahill noted that [Appellant] named Bruce Lee as an associate. After [Appellant] and Bruce Lee were arrested, Detective Singleton obtained two buccal swabs from each man and submitted them to the criminalistics laboratory.

At trial, Gamal Emira testified as a forensic science expert. Mr. Emira analyzed the evidence submitted to the criminalistics laboratory and prepared a report. The dark red stain swab [taken from the pool of blood on the floor of the club] tested positive for blood. Mr. Emira did not see any blood stains on visual examination of the black baseball cap. He observed a rootless human brown hair fragment. He also cut a piece of the sweatband from the cap for identification purposes. He also swabbed the recovered eyeglasses. His visual examination of the tan size 11½ Timberland boots recovered from [Appellant] reaped one microscopic brown stain on the left side of the left boot. He did not find any other stains. Mr. Emira testified that he suspected that it was blood, but he did not conduct blood testing because of the sample's small size. Instead, he swabbed the stain and submitted it for DNA testing. Mr. Emira also observed brown stains during his visual examination of the two pairs of size 13 Timberland boots recovered from Bruce Lee. Mr. Benjamin Levin, a DNA science expert, received and analyzed the swabs Mr. Emira submitted to the

5

DNA laboratory. Mr. Levin concluded to a reasonable degree of scientific certainty that the dark brown stain swab recovered from the banquet room dance floor was from James Anderson. There were no DNA results from [Appellant's] left Timberland boot, the sweatband, the eyeglasses, or Bruce Lee's right Timberland boot.

On February 22, 2012, Bruce Lee entered into a negotiated guilty plea to third-degree murder, at CP-51-CR-0000746-2009. On that same day, Bruce Lee was sentenced to an imprisonment term of seven (7) to fourteen (14) years.

*Commonwealth v. Williams*, 2016 WL 5389061, at *1-4 (Pa. Super. Aug. 30, 2016).

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Defendant raised the following issues in his statement of matters complained of on appeal[1]:

1. The Court erred in not granting a new trial based upon the newly discovered evidence of Bruce Lee. Specifically, Mr. Williams posits that he has met all prongs of the newly discovered evidence test and since the court only ruled that he failed to meet the last prong, i.e., that this new evidence was not likely to compel the grant of a new trial, this was error.
2. Moreover, it is respectfully submitted that contrary to the court's finding of a lack of credibility Mr. Lee was credible based on his testimony, the fact that Steven Murphy corroborated his testimony at the very time his story, and given that Mr. Lee, at the Preliminary Hearing asked Mr. Williams counsel why he was there because he did not do anything to warrant being arrested.
3. Furthermore, all of the witnesses who saw persons assault the decedent identified Mr. Lee, not Reggie Williams as the perpetrator of the crime, except Harvey Tilghman.
4. However, Mr. Tilghman did not come forward immediately and Steven Murphy who did speak to the police the night of the incident, said that it was Mr. Tilghman fighting with Bruce Lee rather than Mr. Tilghman fighting with Reggie Williams, which was directly contrary to Mr. Tilghman's testimony. Therefore, and again, the Court erred in denying the grant of a new trial.

## DISCUSSION

In his first claim, defendant contends that this court erred in not granting a new trial based on the after-discovered evidence presented in Bruce Lee's affidavit. Here, the burden was on defendant to show, by a preponderance of the evidence, that each prong of the after-discovered

---

[1] The following is a verbatim account of defendant's statement.

6

evidence standard has been met. *Commonwealth v. Rivera,* 939 A.2d 355, 359 (Pa. Super. 2007). Thus, the trial court must develop the record and make the determination of whether a new trial is warranted. *See* Pa.R.A.P. 302(a). Unless the trial court has clearly abused its discretion in denying a new trial on the basis of after-discovered evidence, its order will not be disturbed on appeal. *Commonwealth v. Cull,* 688 A.2d 1191, 1198 (Pa. Super. 1997). "Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Young,* 989 A.2d 920, 924 (Pa. Super. 2010).

In order to obtain relief based on after-discovered evidence, defendant bears the burden of proving that the new evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. *Commonwealth v. Montalvo,* 986 A.2d 84 (Pa. 2009).

On remand and after receiving Bruce Lee's affidavit, this court held an evidentiary hearing over several days, wherein Mr. Lee testified as a witness for defendant. Mr. Lee claimed he was the only person who attacked the decedent and that defendant was on the first floor of the club during the fatal altercation on the second floor of the night club. N.T., 8/18/17, at 21-23. Mr. Lee further claimed that he refused to testify in defendant's second trial because he was "upset pertaining to my situation as far as sentencing". *Id.* at 24. Mr. Lee asserted that he had since had a "change of heart" and wanted to help appellant. Lee Affidavit at 2. At the conclusion of the evidentiary hearing, this court stated:

> The record reflects that Bruce Lee was a friend of Reggie Williams, the Defendant and petitioner herein, yet although he could have [he] failed to exculpate him at the two previous trials[.] Mr. Lee declined to testify in the first trial which ended in a mistrial. Mr. Lee declined to testify in the second trial which ended in a conviction

7

of petitioner Reggie Williams. Interestingly enough, at the time of the second trial, Mr. Lee had already pled guilty, was serving a sentence and did not have a 5th Amendment [p]rivilege. Nevertheless, he told Mr. McGill that he would not testify because if it was not for Williams, he would not be here. So, the issue is, was Bruce Lee a credible witness when he testified at this hearing? He was not. Thus, Mr. Williams has failed to meet at least the fourth prong and is not entitled to a new trial. The request, motion for a new trial is denied[.] and the post conviction relief petition is formally dismissed.

N.T., 3/9/18, at 34-35.

After consideration of the record and Mr. Lee's unreliable testimony, this court concluded that the after discovered evidence was not of such a nature and character that a different verdict would likely result if a new trial was granted. Therefore, the fourth requirement of the test for after-discovered evidence was not met. If all prongs are not met, then the claim must be dismissed. *Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007).

Defendant's second claim is that Bruce Lee was credible based on his testimony. However, at the conclusion of a lengthy evidentiary hearing, this court found that Bruce Lee was not credible for the reasons stated above. Thus, this claim is therefore meritless.

Defendant's third claim is that "all of the witnesses who saw persons assault the decedent identified Mr. Lee, not Reggie Williams as the perpetrator of the crime, except Mr. Tilghman." At trial, the Commonwealth presented eyewitness testimony from Harvey Tilghman, Loretta Epps, and Jana Perry. "In sum, there was testimony by Ms. Epps that two people were stomping on Mr. Anderson. Mr. Tilghman identified one of those people as defendant, and Ms. Perry identified another as Bruce Lee." *Commonwealth v. Williams*, 2016 WL 5389061, at *7 (Pa. Super. Aug. 30, 2016). The Superior Court found that the witnesses' testimony was not so inconsistent as to be inherently unreliable as a matter of law, and it was not unreasonable that their statements would differ and there would be inconsistencies in their versions of the attack. *Id.* "Even though Mr. Tilghman did not identify Mr. Lee as a stomper, and Ms. Perry did not identify defendant, their

8

testimony indicates that they were viewing the altercation from different perspectives and distances, and the club was dimly lit and crowded." *Id.* Defendant's third claim is therefore meritless.

Defendant's fourth and final claim is that Mr. Tilghman was not a credible witness because "...[he] did not come forward immediately and Steven Murphy who did speak to the police said that it was Mr. Tilghman fighting with Bruce Lee rather than Mr. Tilghman fighting with Reggie Williams...". While defendant presented several witnesses who testified that defendant was on the first floor of the club at the time of the altercation, Mr. Tilghman's testimony contradicted that evidence. *Commonwealth v. Williams*, 2016 WL 5389061, at *7 (Pa. Super. Aug. 30, 2016). As the trier of fact, the jury was free to believe all, part, or none of the evidence while passing upon the credibility of witnesses and assigning weight to their testimony. *Commonwealth v. Troy*, 832 A.2d 1089, 1092 (Pa. Super. 2003). At trial, the jury rejected defendant's version of events and accepted the testimony of Harvey Tilghman, Loretta Epps, and Jana Perry. The Superior Court stated, "We discern no abuse of discretion in the trial court's rejection of Appellant's claim that the Commonwealth's witnesses were so inconsistent as to render the verdict speculative or mere conjecture". *Williams*, at *8. Therefore, defendant's fourth claim challenging the credibility of Mr. Tilghman's testimony is meritless.

Accordingly, for the foregoing reasons, the defendant's motion for a new trial should be DENIED.

BY THE COURT:

SANDY L.V. BYRD          J.

9